IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

RAYMOND DAVIS
*Defendant*.

Criminal No.:  ELH-13-628

**MEMORANDUM OPINION**

Raymond Davis, who is self-represented, is currently serving a sentence of 120 months at

Elkton FCI, with credit from January 23, 2014.  ECF 236 (Judgment).  On May 18, 2020, Davis

submitted a pro se motion for compassionate release.  ECF 295.  By Memorandum (ECF 302) and

Order (ECF 303) of June 23, 2020, I denied that motion, without prejudice, because the defendant

failed to exhaust his administrative remedies.  Davis subsequently renewed his motion for

compassionate release.  ECF 307 (the "Motion").  It is supported by an exhibit.  ECF 307-1.

The government opposes the Motion.  ECF 325 (the "Opposition").  It is supported by one

exhibit.  ECF 325-1.  Defendant has not replied and the time to do so has expired.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the

Motion.

### I.  Background[1]

On November 7, 2013, Davis and five other defendants were indicted on the charge of

conspiracy to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and

846.  ECF 9 at 1.  A Superseding Indictment was filed on December 12, 2013 (ECF 42), which

added two defendants.  In addition to the conspiracy charge (Count One), Davis and others were

---

[1] Where appropriate, I have drawn on the factual and procedural background set forth in
my Memorandum Opinion of June 23, 2020.  *See* ECF 302.

charged in Count Two with conspiracy to distribute 28 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846. A Second Superseding Indictment was filed on March 27, 2014. ECF 88. In addition to the earlier charges in Counts One and Two, Count Ten charged Davis and a codefendant with possession with intent to distribute heroin on October 29, 2013. And, Count Eleven charged Davis and others with possession of a firearm on October 29, 2013, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

On July 10, 2014, pursuant to a Plea Agreement (ECF 137), Davis entered a plea of guilty to the lesser included charge in Count One of the Second Superseding Indictment, *i.e.*, "Conspiracy to Distribute and Possess with Intent to Distribute 100 grams or more of a Mixture or Substance Containing Heroin, in violation of 21 U.S.C. § 846." *Id.* ⁋ 1; *see also* ECF 136.

The parties contemplated a base offense level of 32, pursuant to Section 2D1.1(c)(4) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). *Id.* ⁋ 6(b). And, the parties agreed that because defendant possessed a firearm in connection with drug trafficking, his offense level would be increased by two, under U.S.S.G. § 2D1.1(b)(1). *Id.* Therefore, after taking into account three deductions based on Davis's acceptance of responsibility, the parties contemplated a final offense level of 31. *Id.* ⁋ 6(c).

Moreover, in anticipation of the then-upcoming changes to the Drug Quantity Table in Section 2D1.1, the government agreed not to contest an additional two-level downward variance. *Id.* ⁋ 6(d). In exchange, defendant agreed not to seek a sentence reduction under 18 U.S.C. § 3582(c)(2), based on the retroactive application of the amendment to U.S.S.G. § 2D1.1. *Id.*

Under the Plea Agreement, there was no agreement as to Davis's criminal history or criminal history category. *Id.* ⁋ 7. But, the plea was tendered pursuant to FED. R. CRIM. P. 11(c)(1)(C), by which the parties agreed to a term of imprisonment of 132 months' imprisonment

as the appropriate disposition. *Id.* ¶ 9. Subsequently, to avoid a sentencing disparity with other defendants, the parties agreed to a sentence of 120 months of incarceration. *See* ECF 230 at 3.

The Plea Agreement included a factual stipulation. ECF 137, ¶ 6(a) at 4-6. According to the stipulation, from August 2012 to November 2013, Davis participated in a conspiracy to distribute heroin and from June to November 2013, he conspired to distribute cocaine base. *Id.* at 5. In furtherance of the heroin conspiracy, Davis would "obtain quantities of heroin" from his coconspirators "and provide that heroin to lieutenants who managed the street level distribution of heroin" in the area of the Gilmor Homes in West Baltimore. *Id.* Davis "also assisted with the cutting and packaging of heroin" at a stash location that he helped to maintain. *Id.* Davis's phone was subjected to a wiretap pursuant to a court order, with the result that "hundreds of conversations were intercepted in which [he] discussed conducting, financing or managing an illegal narcotics distribution enterprise." *Id.* Moreover, on multiple occasions Davis made specific references to the distribution of heroin. *Id.*

A coconspirator was arrested on June 25, 2013. Law enforcement recovered 228 ziplock bags of heroin and $4,500 in U.S. currency. *Id.* Another codefendant was arrested on October 29, 2013, and he was found with 32 grams of heroin and $2,157. *Id.* Thereafter, pursuant to a search warrant at the stash location, law enforcement agents recovered 1.6 kilograms of heroin and drug distribution materials. *Id.* A Smith & Wesson .357 revolver was also recovered. *Id.* Another search warrant was executed on November 30, 2013, at the home of one of Davis's coconspirators. *Id.* at 6. Law enforcement recovered $117,510 and drug paraphernalia. *Id.* In the Plea Agreement, Davis "admits that this money consists of the proceeds of illegal drug trafficking." *Id.*

Further, Davis admitted that he and other conspirators conspired to distribute at least one kilogram but less than three kilograms of heroin.  *Id.*  And, Davis admitted that the revolver was possessed by him and others to protect the stash.  *Id.*

The Presentence Investigation Report (ECF 154, the "PSR") reflected that Davis, born on July 25, 1987 (*id.* at 1), had three prior adult criminal convictions.  *Id.* ¶¶ 33-39.  Specifically, on September 13, 2005, at the age of 18, Defendant was arrested after an officer stopped and searched a Yamaha scooter on which Davis was a passenger.  *Id.* ¶ 34.  Davis and his codefendant advised the officer that they had purchased the scooter.  *Id.*  But, the scooter's VIN number had been destroyed and, consequently, the officer could not discern whether the scooter had been stolen.  *Id.* Following a search of the scooter, the officer found a brown bag that contained 95 glass vials.  *Id.* Ultimately, on September 7, 2006, defendant was given one day of unsupervised probation before judgment for one count of "Man Serial Number Retain Item."  *Id.* ¶ 33.

Soon thereafter, on November 28, 2006, Davis pled guilty in the Circuit Court for Baltimore City to one count of having a handgun on his person as well as one count of possession of a firearm by a minor.  *Id.* ¶ 35.[2]  As to the former, defendant was sentenced to three years' imprisonment, all but ten months suspended.  *Id.*  Regarding the latter, Davis was given a concurrent sentence of four years' incarceration, with all but ten months suspended.  *Id.*  And, Davis was sentenced to a four-year term of probation.  *Id.* ¶ 35.  Defendant's sentence expired on January 2, 2010.  *Id.*

Then, on April 23, 2010, Davis was convicted of violating his probation.  *Id.*  According to the violation report, defendant was arrested on August 4, 2009, for the theft of a motor vehicle,

---

[2] Davis was arrested on these charges on July 12, 2006, at which time he was eighteen years of age.  *Id.*

although this charge resulted in a nolle prosequi.  *Id.* ¶ 37.  Furthermore, defendant had failed to respond to his probation officer as instructed.  *Id.*  As a result, defendant was sentenced to a two-year term of imprisonment.  *Id.* ¶ 35.  Davis was paroled on January 5, 2011, and his parole expired on March 16, 2012.  *Id.*  About nine months later, on December 12, 2012, defendant was convicted of unlawful possession of marijuana, for which he was fined.  *Id.* ¶ 38.

In total, the PSR assigned defendant five criminal history points.  *Id.* ¶ 40.  That yielded a criminal history category of III.  *Id.*

According to the PSR, defendant reported to be in good mental and physical health, although his sister indicated that he had been diagnosed with borderline high blood pressure several years earlier.  *Id.* ¶¶ 66, 67.  In addition, Davis advised that he had never experienced any issues with drugs or alcohol.  *Id.* ¶¶ 68, 69.  However, his sister represented that Davis used marijuana on a daily basis.  *Id.* ¶ 69.

The PSR also reflected that defendant left high school in his sophomore year.  *Id.* ¶ 70.  Moreover, he had been unsuccessful in obtaining a GED.  *Id.*

 Sentencing was held on March 3, 2015.  ECF 235.  According to the PSR, Davis was 27 years of age at the time.  ECF 154 at 1.  With a final offense level of 29 and a criminal history category of III (ECF 237), defendant's advisory sentencing guidelines called for a period of imprisonment ranging from 108 to 135 months.  *Id.*  And, defendant was subject to a mandatory minimum sentence of five years' imprisonment, with a maximum possible sentence of forty years. *See* 21 U.S.C. § 841(b)(1)(B); ECF 154 ¶ 53.

The Court sentenced the defendant to 120 months' imprisonment, with credit from January 23, 2014.  ECF 236.  In addition, the Court imposed a five-year term of supervised release.  *Id.* at 3.

As referenced earlier, Davis submitted a motion for compassionate release on May 18, 2020. ECF 295. There, he argued that the COVID-19 pandemic presented an "extraordinary and compelling" circumstance that warranted a reduction of his sentence such that he could "finish [his] remaining time on home confinement." *Id.* at 1-2.

As noted, by Memorandum (ECF 302) and Order (ECF 303) of June 23, 2020, the Court denied Davis's motion, without prejudice, because he had failed to exhaust his administrative remedies, as required by 18 U.S.C. § 3582, or otherwise explain why the Court should waive the exhaustion requirement. ECF 302 at 11-13. However, I also said, *id.* at 12:

> [E]ven if Davis exhausted his administrative remedies, he fails to identify any extraordinary and compelling reason to justify his release. He is not terminally ill, over 65 years of age, and does not claim to have any of the CDC risk factors for COVID-19, which would establish eligibility for compassionate release. Fear of contracting the novel coronavirus while incarcerated is not a sufficient reason for granting compassionate release. "Simply put, the coronavirus is not tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG13-544, 2020 WL 1434130, at *3 (D. Md. March 24, 2020). And, even if the Court determined that the defendant met one of the conditions establishing an extraordinary or compelling reason justifying release, the Court's analysis of the factors under 18 U.S.C. § 3553(a) leads the Court to conclude that release is not warranted.

In the Motion, Davis advises that he remains incarcerated at FCI Elkton in Lisbon, Ohio. ECF 307 at 1. He is now 34 years of age. ECF 154 at 1. And, of import here, Davis avers that he submitted a request for compassionate release with Warden Mark Williams at FCI Elkton on July 9, 2020. ECF 307 at 5. Because more than thirty days transpired without a response from the Warden, Davis exhausted his administrative remedies. *Id.*[3]

Records submitted with defendant's first motion for compassionate release indicate that Davis had a projected release date of September 10, 2022. *See* ECF 295-1. However, a search of publicly available records reveal that his release is now scheduled for November 17, 2022. *See*

---

[3] The government does not dispute exhaustion.

*Find an Inmate*, Federal Bureau of Prisons, http://www.bop.gov/inmateloc/ (last visited Nov. 9, 2021).

## II.      Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  Originally, a court was permitted to alter a sentence only upon a motion by the Director of the Bureau of Prisons ("BOP").  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and

compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in

U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A)

Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling

reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing

Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy*, 981 F.3d at

276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last

updated in November 2018, prior to the enactment of the First Step Act in December 2018.  *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the

court may reduce a sentence where warranted by extraordinary or compelling reasons (§

1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§

1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community

(§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be

based on circumstances involving illness, declining health, age, exceptional family circumstances,

as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to

U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part, as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets
> the requirements of subdivision (2), extraordinary and compelling reasons exist
> under any of the circumstances set forth below:
>
> (A)    **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced
> illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*,
> a probability of death within a specific time period) is not required. Examples
> include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-
> stage organ disease, and advanced dementia.
>
> (ii) The defendant is—

      (I)  suffering from a serious physical or medical condition,

      (II) suffering from a serious functional or cognitive impairment, or

      (III)  experiencing deteriorating physical or mental health because of the aging process,

         that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence.  Application Note 1(C) concerns Family Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy

statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, *before* the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F.Supp.3d 562, 565 (W.D. Va. 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting

that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).

To be sure, compassionate release is a "rare" remedy.  *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *United States v. High*, 997 F.3d 181, 187 (4th Cir. 2021) (internal quotation marks omitted).

### B.  COVID-19[4]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5] Defendant filed his motion for compassionate release in February 2021.  At that time, as now, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis. This is because, the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). As of November 9, 2021, COVID-19 has infected more than 46 million Americans and caused approximately 755,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Nov. 9, 2021).

Although this country saw a reduction of COVID-19 cases in prior months, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough*

*Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, "[i]nfections have spiked to the highest levels in six months"). Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants").

But, in recent weeks, the trend has again become more favorable. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."). Even so, health authorities warn that there remain reasons for caution, including the relatively low levels of vaccination in some parts of the country, as well as the encroachment of colder weather and the impending holiday season, which will lead to an increase in the number of indoor gatherings, where the virus can more easily spread. *See* Kamp & Abbott, *supra*.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19 to reflect the most available data, most recently in October of 2021.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Oct. 14, 2021), https://bit.ly/38S4NfY. [hereinafter *Certain Medical Conditions*]. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), bronchiectasis, bronchopulmonary dysplasia (chronic lung disease affecting newborns), interstitial lung disease, cystic fibrosis, and pulmonary embolism; pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathy, and hypertension; HIV; being immunocompromised; liver disease; mood disorders, including depression and schizophrenia spectrum disorder; obesity, with a body mass index ("BMI") of 25 or higher; pregnancy; sickle cell disease or thalassemia; smoking (current or former); solid organ or blood stem cell transplant; stroke or cerebrovascular disease; substance use disorders; and, tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL &

PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, the CDC cautions that the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person."  *Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective

equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[6]

---

[6] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

---

people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since expanded considerably, and the vaccine was recently approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC News, Oct. 29, 2021,  https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188.  Approximately 68% of all persons twelve years of age and older is fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Nov. 9, 2021).  And, 58% of the total U.S. population is fully vaccinated.  *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines

on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.

As of November 9, 2021, the BOP reported that 137 out of a total 133,704 federal inmates and 277 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 42,594 inmates and 8,318 staff have recovered from the virus; and 266 inmates and seven staff members have died from the virus.  Moreover, the BOP has administered 245,279 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Nov. 9, 2021).

With respect to Elkton FCI, where defendant is imprisoned, the BOP reported that as of November 9, 2021, out of a total of 1,578 inmates, none have tested positive.  Two staff members have also tested positive for COVID-19, and 738 inmates and 88 staff have recovered at the facility.  In addition, 1,268 inmates, as well as 233 staff members, have been fully inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, *supra*; *FCI Elkton*, Federal Bureau of Prisons, http://www.bop.gov/locations/institutions/elk/ (last visited Nov. 9, 2021).

## IV.  Discussion

Davis submits that his release from prison is warranted because of the heightened risk he faces from COVID-19 while incarcerated.  *See generally* ECF 307 at 1-4.  He alleges, *inter alia*, that COVID-19 is prevalent throughout Elkton FCI (*id.* at 1-2); BOP staff members refuse to wear masks (*id.* at 1); his living quarters are overcrowded (*id.* at 2); he has previously contracted COVID-19 (*id.* at 3; *see* ECF 307-1 at 3); and, BOP officials have previously misrepresented the conditions regarding COVID-19 at Elkton FCI to other government officials, including a federal judge.  *Id.* at 3-4; *see* ECF 307-1 at 1-2.

However, Davis, who is now 34 years old, does not claim to suffer from any medical conditions that would, according to the CDC, render him particularly vulnerable to COVID-19. And, the government avers that when defendant contracted COVID-19 in May 2020, he remained asymptomatic.  ECF 325 at 2; *see* ECF 325-1 at 2-5.

Moreover, according to the government, although a large number of inmates housed within Elkton FCI contracted COVID-19 during the initial stages of the pandemic, BOP staff have since implemented substantial remedial measures to guard against the risk of a future outbreak.  *See* ECF 325 at 2-4.  Furthermore, as earlier described, the spread of COVID-19 at Elkton FCI appears to be under control, at least for the time being.  *See* https://www.bop.gov/coronavirus/, *supra*.  In addition, over 1,260 inmates at Elkton FCI have been fully vaccinated against COVID-19.  *See id.*

As mentioned in ECF 302, fear of COVID-19 does not constitute an extraordinary and compelling circumstance that warrants an inmate's release.  Judge Chasanow of this Court explained: "While all share the concern of the public health challenges caused by COVID-19, and appreciate the heightened anxiety experienced by those incarcerated in correctional facilities . . ., generalized and unspecific reasons . . . do not satisfy the standard for compassionate release." *United States v. Harris*, DKC-08-319, 2020 WL 2512420, at *1 (D. Md. May 15, 2020).

Davis is not terminally ill nor over 65 years of age.  Nor does he suffer from any underlying medical conditions that would put him at a heightened risk of severe disease if he were to contract COVID-19.

In sum, given Davis's youth and apparent good health, the limited spread of the virus in Elkton FCI, as well as the availability of effective COVID-19 vaccines, I am of the view that defendant has failed to establish an extraordinary and compelling reason to justify his release from prison, pursuant to 18 U.S.C. § 3582(c)(1)(A).

Therefore, I need not address whether Davis's release would be consistent with the factors set forth in 18 U.S.C. § 3553(a).

### V.  Conclusion

For the reasons set forth above, I shall deny the Motion (ECF 307), without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: November 10, 2021                                      _____/s/_____
                                                                                    Ellen L. Hollander
                                                                                    United States District Judge